Case number 17-3091 at L. United States of America v. Jose Emanuel Garcia Sota, also known as Juan Emanuel Maldonado, also known as Zafado, also known as Zafado Appellant. Mr. Kaplan for the appellants, Mr. Pelletier for the appellee. Good morning, Mr. Kaplan. Good morning, Your Honor. My name is Matthew B. Kaplan, and I represent the appellant, Jose Emanuel Garcia Sota, and also speak for the other, the co-appellant in this case. Your Honors, in our view, 18 SC 1114 does not apply outside the United States. That, in our view, is a straightforward application of Morrison and its progeny. If Congress has not affirmatively and unmistakably indicated that a law applies outside the United States, it does not so apply. What the teaching of Morrison's teaching is that Congress cannot look at, or sorry, that a court cannot look at what Congress might have thought if it had thought about the issue. It must look only at whether or not there's explicit or other clear indication of extraterritoriality in the relevant statute. Now, of course, the government... Can I ask this clarification question? Sure. Is it your, I didn't see this in your briefs, but is it your contention that applying it in such fashion would violate the law of nations? I think it would violate, you're right, Your Honor, we didn't address that issue in our brief, I think it would violate the law of nations. I mean, I think it's also clear that if there had been an explicit, clear indication of congressional intent, Congress is free to violate the law of nations if it wants to. But I think it would violate the law of nations applying U.S. law to what is essentially a street crime in Mexico. But you make no such claim about 1116, do you? No, we don't make that claim about 1116. We don't, the international protected person statute, we don't make such a claim. And again, we don't focus on the international law, our focus is on Congress and whether or not there's a clear indication of congressional intent. The government, of course, points to Bowman and says that Bowman, as I read their brief, it says that Bowman essentially establishes an exception to Morrison and the cases that follow Morrison. First of all, if Bowman is inconsistent, the extent that Bowman is inconsistent with Morrison, it has been overruled by Morrison. But even by its terms, Bowman applies only to statutes that clearly target the U.S. government. And Bowman specifically involved fraud targeting the U.S. government. 1114 is a very different statute, it doesn't require any... I don't read Bowman to have a specific intent requirement, though. I mean, the statute at issue there, looking at the statute, I didn't see a knowing or intentional element in the statute. Did I miss it? I don't think there, I mean, Bowman does not refer to a knowing or intentional, does not refer to a specific intent. But the crimes set out in Bowman are crimes where I think it would be, by their inherent nature, it's clear that they're targeting the U.S. government. You're targeting, but I guess there's no requirement in Bowman that you had to know that the fraud was being perpetrated against the U.S. government. Well, Bowman doesn't address that issue, but I think the nature of the crimes in Bowman are very different than the crimes here. The nature of the crimes in Bowman are something that would be clear, it's clear that there was targeting of the U.S. government. Whereas in this case, you don't have such targeting of the U.S. government. You don't necessarily have that under the statute, and in fact, under the facts of the case, you didn't have that. The people who attacked these American agents did not know that they were American agents, and in fact, would not have attacked them if they had known that they were American agents. I think one of the key differences between this case and the statute issued in this case in Bowman is the extraordinarily broad nature of the statute here. There's no requirement that under this statute, under 1114, there's no requirement, obviously, as we've just said, that the person, the defendant, have any knowledge that they're targeting a person connected with the U.S. The law encompasses persons who happen to be assisting American employees in carrying out their official duties, and again, there's no need that the person, the defendant, know that the person being targeted is engaged in that assistance. And the law encompasses not just murder, but manslaughter, which can be unintentional conduct. As we set up in our brief, we give an example in our brief of the maid of a political officer in the U.S. Embassy in Columbia, for example, who was sent to the supermarket to buy groceries for an official reception, and if she was killed in the street by a drag racer, that, under the government's interpretation of this statute, would be a federal crime. Are you making an intent defense vis-à-vis 1116? No. With the 1116 statute, we're not challenging the conviction, at least under the — we're not challenging the extraterritorial reach of 1116. And on the application of 924J, can the death that was found in connection with 1114 be applied in applying 924J to the convictions under 1116? The — what we've argued with the 924J — what we've argued at one point with the 924J conviction is that that was based on a — the jury was told it could only make a special finding that a death had resulted if it convicted under 1114. And — Well, is that — let's assume that was an error. Was it a harmless error? I don't believe it was a harmless error, Your Honor, because the jury was told — How would things have been different if it had occurred in connection with 1116? I think that if the jury — I think fundamentally the appellants had a right to have the jury follow the instructions and make a finding. No, I understand that. But I'm just asking, can you identify any scenario under which the fact that the conviction is under 1116 makes the finding of death for purposes of 924J ineffective? It's — The same death, right? It is the same death, Your Honor. And I guess our — it's — in our view, the error was not harmless. But in any event, in our view, if the 1114 conviction is overturned, we think that the case needs to be remanded to the district court for resentencing under the remaining charge. What would the terms of resentencing be? I think that the district court would — assuming 1114 is — that conviction is vacated, I think the district court would have to reevaluate its sentencing. Well, but what would the terms of reevaluation be? I think the district court — if there was no surviving conviction for murder, I think the district court would have to evaluate whether a life sentence would be appropriate under 924C. So your contention that if we assume that the 1114 conviction is vacated, that you cannot have a life sentence or at least a mandatory life sentence under 924J if the predicate is the 1116 attempted murder conviction? First of all, I think you can't have without the specific finding that there was a death. And I think that specific finding — special finding by the jury was — cannot stand because it was based on jury instructions which did not allow it. But even setting that aside, I think the district court would have discretion as to whether or not it wanted to impose a life sentence. And it might — it might choose not to do so. All right, we'll give you a little bit of time on the rebuttal. We'll hear from the governor. Thank you very much. May it please the court, John Pelletieri from the Department of Justice on behalf of the United States. Both 1114 and 924C contained clear indications that Congress intended the statutes to apply — to apply extraterritorially. I'll start with 1114. This court in Delgado and applying the Supreme Court's decision in Bowman identified attributes of the statute that, if present, contained clear indications — What would Delgado have to do with this case? Well, Delgado applies Bowman and establishes that Bowman applies with full force to this day. And it had applied — Well, it's — in Delgado we're dealing with a statute which by its very nature seemed to encompass extraterritorial activity. That's not the case with this statute, is it? Well, Your Honor, on its — It doesn't really teach anything about this fact. Well, Your Honor, on its face, in our view, the statute does indicate extraterritorial applications. How so? Well, I can get into a lot. So if you look at the time of the — at the time of the amendment of 1114, before AEDPA in 1996, the statute, instead of in its present form, it contained a long list of the types of officers that — employees that were contained. And it specifically contained any — Can you tell us what statute it is now and tell us what it is about it that survives Morrison so far as clearly establishing extraterritoriality? Well, the statutory history here — No, no, no. No, no. Forget about the history. Well, tell me about the statute. The statute — under Morrison, the statute has to clearly express extraterritoriality, doesn't it? It does not have to contain an express provision of extraterritoriality. So in RJR Nabisco, there was no express statement of extraterritoriality. So what is there in this statute that indicates it applies beyond the territory of the United States? It's the function of the statute in applying — in targeting harm to the United States government because it protects United States employees and officers during the course of performing their official duties, that it protects the harm, and it has many obvious applications outside of the United States, in particular because it can — Well, the statute just establishes that it could apply outside the United States if Congress passed a statute that did so. But I'm interested in what in this statute, as it is, tells me that it applies. You start with the assumption that U.S. code, Title 18, applies to the United States territory. Yes, Your Honor. Under Morrison, you have to have something to cause us to believe — not just believe, but to affirmatively see that Congress extended it beyond the territory of the United States. Yes. I think with — And I didn't find in your brief anything important for the statute that told me that. Well, aside from the fact that it targets harm, if you look to the way it includes the term uniformed members of the armed services, and if you look to — How would that be any different if the statute is or is not in the territory? Well, because I think it demonstrates Congress's intent, and that was added in 1996. And I would just like to point out what the statute said when Congress added that. It included, among the list of employees and officers that were included in the statute and protected, any security officer of the Department of State or the Foreign Service. It also specifically included any officer or employee of any department or agency within the intelligence community. I mean, that shows a clear indication that Congress intended this to apply to employees abroad. Then when Congress amended the statute in 1996, it took away this long list, and it said any officer or employee. And then it made clear that it encompasses members of the uniformed services. And Congress indicated in the House committee report with this, it specifically mentioned what prompted AEDPA a few events. And one of the events that it identified was the murder of William Higgins in Lebanon in, I believe, 1990. So together with the fact that prior to 1996, the statute specifically included security officers of the Foreign Service and the State Department, it included members of the intelligence community, and then Congress broadened it to include uniformed armed services. And in the legislative history specifically cited to a murder of a U.S. member of the armed services abroad in Lebanon, all of this and all of that is on top of all of the Bowman factors, plus the fact that at the time Congress enacted AEDPA and revised it in 1996, the only courts to address the extraterritoriality of this statute had held clearly that it applied extraterritorially. We cite the Benitez decision in the 11th Circuit. And in the Delgado case, this court also cited the Felix Gutierrez decision in the 9th Circuit, which also so held. And that's at 940 F. Second, 1200. It's cited in the Delgado case. Both those cases prior to 1996, when Congress broadened the statute, had held that the statute applied extraterritorially. Under the canon that Congress is assumed to be aware of authoritative interpretation, construction of a statute, and when it amends it, and certainly when it broadens the statute, it should be deemed fair. That canon works only if it's like a broad and basically a consensus. You cited the one case in your brief, the 11th Circuit case. Now you've mentioned the 9th Circuit case, but that's far from a consensus. Well, it's the only decisions that addressed it, and they clearly plainly held. And this is not – so, for example, in some of the cases that my friend has cited regarding this canon, there's a little bit of ambiguity. There's some differences. There's complex statutory schemes. This is a binary issue. Does it apply extraterritorially or does it not? Two courts held clearly that it does. And also, I would note that these were not obscure cases. They were both reported on in the Washington Post. These were murders of DEA agents in foreign countries that got public attention. Can I just ask you the same question I asked your friend on the other side? I didn't see it in your brief, but would this prosecution be consistent with the law of nations? Absolutely, Your Honor. Did you brief that issue? Did I miss it in your brief? Well, it's not relevant because it's – the Charming Betsy canon, Your Honor, holds that when applying – when determining the – and construing a statute to determine its extraterritorial effect, this court will construe a statute to the extent it can not to be inconsistent with international law. But the Charming Betsy canon also makes clear that Congress is not constrained by international law.  What we've said in Ali and other cases is that if we can't tell if the statute's ambiguous, we look to see whether it's – whether the extraterritorial application is consistent with international law. Yes, Your Honor. And when we've said that it's not, we've deemed that to be persuasive in finding that it shouldn't apply outside the U.S. And the defendants have never invoked the Charming Betsy canon in this case, and for good reason, because the protective principle in international law allows the government to enact laws that apply abroad, that protect – That's a different question. That rule of law to which you're applying concerns whether Congress could pass such a statute. Yes. It really has nothing to do with whether Congress did in this case, does it? Well, I'm just – in determining whether this – right, exactly, Congress could, because international law permits it. Therefore, the Charming Betsy doesn't provide any – doesn't provide any direction in this case. It's not helpful one way or the other. No, it's not, Your Honor. It just doesn't provide any – any instruction, any guidance on how to interpret the statute. This Court has to apply all the canons of statutory interpretation to determine whether there's a clear indication of congressional intent. And we believe that the Bowman factors by themselves, which this Court applied in Delgado, provide that clear indication. But there's more than Bowman. There's the – there's the – How do we know Bowman survives RGR, Nabisco, and Morrison? I mean, those – granted, the Supreme Court doesn't cite Bowman at all in those cases, but it seems to go in a different direction than Bowman did as far as how we're supposed to undertake this exercise. Well, the Court has never rejected Bowman, and neither has any court of appeals as far as we're aware. And Bowman, in our view, is consistent with those cases because it's one method of determining whether there's a clear indication. You look to all of the canons of statutory interpretation, and this is something, just like in RGR and Nabisco, where you looked to the incorporation of the predicates, that was another statutory linguistic indication. Here, Bowman provides another set of circumstances, attributes of a statute that also provide guidance of Congress's clear intent. So in our view, Bowman is certainly reconcilable with other cases. It's never been overruled by the Supreme Court, certainly, or any other court of appeals has never determined that Bowman does not bind them. And therefore, in our view, Bowman determines the outcome of this case, but it's not the only thing. As we discussed in 1996, the language of it beforehand, the expansion, all of the statutory interpretation. I'm not sure why the language of it beforehand cuts in your favor. You might have a stronger case if that was still the language, if they had a list that included those security guards and such. Perhaps that would be some indication, but the court simply says any officer of the United States. I'm not sure how that gets you anywhere. Your Honor, it's clear that Congress expanded 1114. Rather than having specific lists, it's clear that what Congress intended is that not only was everything on that list going to be included, but more. I don't see how that list has any relevance to the present statute. Congress did not reenact it. That's not the law anymore. Well, I think the statutory history, if you looked at it. So, you know, courts have. You know, Congress doesn't enact statutory history. It's not statute. Well, for example, Your Honor. And this we have to look at the statute somewhat. For example, the Supreme Court has certainly looked at statutory history most recently in the Stokeland case in the Supreme Court. It looked to the definition of a violent felony in the Armed Career Criminal Act. It looked to what Congress had included in it at the time, in 1986, when it defined a violent felony to include robbery. And then it looked to the fact that Congress expanded it, and then it determined that that statutory history indicated that the definition, the first clause of the Armed Career Criminal Act, includes robbery. And so the same here. You have a statutory interpretation. You have a statute that clearly included foreign officers abroad, in our view, and intelligence, members of the intelligence community. Congress expanded the statute. It did so at a time when the only authoritative courts of appeals decisions had held clearly that it applied extraterritorially, and Congress didn't in any way abrogate or reject those decisions. And it expanded it. And it only not only expanded it, it also included, made clear that it included members of the uniformed services, which plainly are going to be, many of them are going to be abroad. Counsel, could I take you to the penalty issue briefly? Yes, Your Honor. You rely on 924J, which in turn incorporates 1111. And what does it tell us, so far as the penalty is concerned, for crimes committed outside the territory of the United States? Well, 924J itself incorporates 924C in terms of its extraterritorial effect. The text and context. Yeah, but it also takes us very directly to 1111, right? Yes. And so what do we find when we get to 1111? Well, Your Honor, 1111 defines the, defines the, defines the, what murder is and what someone has to find in order to commit a murder. Right. And then it has a provision about penalty. Yes, Your Honor. And the provision about penalty talks about the crime when committed within the special maritime and territorial jurisdiction of the United States, right? Yes. So what is left for the penalty for a crime that is based on extraterritorial application? Well, I don't think that the penalty for under 924J determines on whether it applies domestically or extraterritorially. It does provide that there is life. It close references 1111, right? Yes, Your Honor. So don't we have to concern ourselves with 1111? Well, it says if a person who in the course of violating 924C causes the death of a person through the use of a firearm shall, and then it says if the killing is murder as defined in section 11, 111, it doesn't encompass the penalty provisions of 1111, just the definition of murder, then shall be punished by death or any term of years or life. So 924J by its terms only incorporates the definition of murder in 1111 and not the penalties, Your Honor. So it, 24J, 924J does permit life, death, or term of years. Now, in our view, even if this court concludes that 1114 does not apply extraterritorially, the 924C convictions stand in any event because one of the predicates for the 924C conviction was 1116, which indisputably applies abroad, it applies extraterritorially. And because that was one of the predicates charged and undoubtedly proven as a predicate for 924C, then the jury just had to find, well, did the use of a firearm, did it also cause a killing, and was that killing murder under 1111? And the district court instructed the jury that you basically have to find the murder the same way you have to find the same, in the same manner you have to find murder for the 1114 charge. Do you have any cases saying that a finding of a particular element for sentencing, which is connected with one statute, can be later attached to another statute? I don't think the court said you have to find an element for the other statute. I think he was, the way he was phrasing it was that you have to find a murder under 1111. In the same manner, you have to find a murder in 1114. So therefore, if you find a murder in 1114, you have found the murder that's necessary under 924J. So because they both incorporate the same definition of murder under 1111, the court was basically saying if you find the murder, then this is, it's the same standard. And so there's really no dispute that I think the evidence clearly establishes the commission of the murder here and the penalty provision that would trigger the penalty provisions of 924J. And any error in also charging predicates that may be, if this court concludes that 1114 does not apply extraterritorially, any error in charging and instructing those as predicates would be harmless beyond a reasonable doubt, Your Honor. That's similar to what this court found in the Thompson case where there was a conspiracy and there were three objects of the conspiracy charged. One, I believe, was distribution and another one was possession with intent to distribute. This court concluded that possession with intent to distribute does not apply extraterritorially, but the court concluded that the error was harmless because the distribution plainly applied extraterritorially and there was no basis for concluding that instructing the jury on both of those objects of the conspiracy affected the outcome of the trial here. And the same applies here. But how does it apply here when the 1116 conviction is for an attempted murder, not a murder? Well, so the predicate that's charged under 924C does not have to be a predicate that includes murder, Your Honor. So, for example, a 924C can be possession of a firearm in connection with a drug trafficking crime, but then if it causes murder as defined in 1111, then 924J applies here. So similarly here, if the predicate is attempted murder rather than murder, if there's a 924C offense, and then in the course a murder causes a killing, as that's defined in 1111, then 924J applies. There doesn't need to be an identity between the... And it doesn't matter if that murder is outside of the U.S. for the 924J analysis? No, because 924C applies extraterritorially for the reasons identified in RGR Nabisco. As long as the predicate applies extraterritorially, 924C and 924J also, which enhances the punishment for 924C, apply extraterritorially. That's the teaching of RGR Nabisco, which says that if Congress defines predicate offenses as an element of a crime and it defines those predicates to expressly include extraterritorial offenses, then a commission of the crime that's based on those predicates applies extraterritorially as well. And 924C expressly includes as predicates offenses that apply extraterritorially. It specifically cites the MDLEA, which applies extraterritorially, and it also encompasses the Controlled Substance Import and Export Act, which is 21 U.S.C. 951 EXEC, and that includes 959, which, as this Court has concluded in Thompson, obviously applies extraterritorially. It has a provision there. And so Congress clearly determined that all those provide a clear indication that when Congress enacted 924C, it understood that if a defendant committed a 924C offense, if he or she used or carried a firearm during in connection with a predicate that applied extraterritorially, then that offense, the 924C offense, also applies extraterritorially. And there's no basis to distinguish 924J as well because that encompasses the 924C offense as well. And so, therefore, the same reasoning of RGR Nabisco about encompassing those extraterritorial predicates also applies. It applies in that context as well. All right, thank you. Thank you. We'll give you two minutes, Mr. Kaplan. Thank you, Your Honor. First of all, let me highlight the point that Congress has made numerous statutes explicitly extraterritorial. And in particular, it's done so, it did so in the AEDPA, which as counsel pointed out, rewrote the 1114. It established, it made numerous, it created some new offenses and it made other offenses that already existed extraterritorial. But it did not make this offense extraterritorial. And I think the burden is on the government to show extraterritoriality, but even if that were not the case, I think the fact that Congress did that in the AEDPA strongly suggests that it did not want this offense to be extraterritorial. It certainly, there's certainly no clear indication of extraterritoriality. He mentions the intelligence community and the State Department. And, you know, whatever that may mean, those officers, both the intelligence community and the State Department, have a large number of officers operating within the U.S. I don't think that's dispositive. As Your Honor pointed out, that's no longer the law. That was, those terms were in the law, but they're not in the law now. Your Honor mentioned our view on international... But I guess the government says that there's, that the legislative history clearly indicates that Congress wasn't attempting to restrict 1114 with the AEDPA amendments. Do you dispute that? I don't think, I think that's correct. I don't know that there's, that's not clear. I mean, let me put it that way. They changed the language, and certainly in many respects they expanded the coverage of the statute. But I think that in fact supports our argument. It's a very expansive statute, and it's very easy to think that, you know, when it was much more limited, I don't think so, but maybe Congress meant it to apply overseas. But now that it applies not only to every U.S. government employee, but anyone who's helping a U.S. government employee. You're not conceding that it applied extraterritorially before? No, we're definitely, we don't, I don't believe it did. But even if it did, the fact that it expanded, that Congress expanded it, there's an argument that there's less reason for it to apply extraterritorially. Your Honor mentioned international law, and it's correct, we did not specifically in any detail address the international law argument. But certainly we made, we emphasized that one of the reasons for the presumption against extraterritoriality is that foreign countries would be unhappy about us applying our domestic law for street crimes within their home country. But given the protective principle, that would not actually be in violation of international, generally understood international law, if it did apply extraterritorially, would it? I'm not sure that would be the case. I think that would be the case if there was deliberate targeting of U.S. officials. But this law is so broad, I think it goes beyond the protective principle in international law. And let me just... Can I just get your response to the 924, I guess, J issue? And I guess also 924C. So if, let's suppose we agree with you that 1114 does not apply extraterritorially. Why isn't that error harmless if we find that 924C applies extraterritorially with respect to 1116? I think, first of all, we have an argument, I'm sure you're familiar as to why 924C does not apply outside the U.S. But setting that aside, I think the case would need to go back, as I mentioned, to the district court. The district court based that 924J sentence on the fact that there had been a... The defendant had been convicted, both defendants had been convicted of murder. And I think the court would need to reevaluate that decision. But there wouldn't be a basis. If we disagreed with you on 1114 but disagreed with you on 924C, there's no reason to vacate the conviction under 924C. You're saying we should vacate the special finding? That's exactly correct, Your Honor, yes. All right, we have your argument. Mr. Kaplan and Ms. Amato, you were appointed by the court to represent the appellants in this matter, and we thank you for your assistance. Thank you very much, Your Honor. We'll take the case under advisement.
judges: Wilkins, Williams, Sentelle